IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2006

## STATE OF TENNESSEE v. CHRISTOPHER NICHOLAS ORLANDO

**Appeal from the Criminal Court for DeKalb County**
**No. 02-126     Leon Burns, Jr., Judge**

---

### No. M2005-01767-CCA-R3-CD - August 3, 2006

---

The Appellant, Christopher Nicholas Orlando, was convicted by a DeKalb County jury of facilitation of first degree murder, a Class A felony, and sentenced as a Range II, multiple offender to thirty-five years in the Department of Correction.  On appeal, Orlando raises the following issues for our review: (1) whether he was denied his fundamental right to a fair trial because the State failed to (a) disclose the terms of a plea agreement with a key witness and (b) preserve exculpatory evidence; and (2) whether he was sentenced in violation of *Blakely v. Washington.*  After a review of the record, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Kevin S. Latta and J. Hilton Conger, Smithville, Tennessee, for the Appellant, Christopher Nicholas Orlando.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William E. Gibson, District Attorney General; and William Locke, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Procedural Background

On September 18, 2002, the body of Josh Murphy was found on Backbone Ridge off Highway 70 between Sparta and Smithville in DeKalb County.  The deceased had sustained multiple gunshot wounds to the face.  Both fired and unfired .12 gauge shotgun shells, as well as wadding, were found at the scene.  During the investigation, Tennessee Bureau of Investigation (TBI) Agent Bob Krofssik traveled to Kentucky four or five days after the discovery of the body and interviewed Melvin Turnbill.  Turnbill confessed to participating in the murder and implicated the Appellant as

the shooter. The Appellant and Turnbill were jointly indicted for first degree murder; however, because each accused the other of shooting the victim, severance of the defendants was granted as provided by Tenn. R. Crim. P. Rule 14(c).

Prior to trial, Turnbill pled guilty to facilitation of first degree murder and received a twenty-five year prison sentence. Under the terms of the plea agreement, Turnbill agreed to testify for the State. At trial, Turnbill testified that on September 14-15, 2002, he went to Backbone Ridge to manufacture methamphetamine with his friend Josh Murphy. When it started raining, the two gathered their equipment and went to the home of Turnbill's girlfriend, Robin Baker. Murphy left around 2 or 2:30 A.M., and the Appellant arrived at Baker's home around 4:00 A.M. and spent the night. Around 9 A.M., Turnbill discovered that a half-gallon jar of meth oil was missing. Turnbill advised Agent Krofssik, "I told [the Appellant] to go get my gun that he was keeping for me, and I was going to kill whoever got my meth oil." Turnbill reported that the two departed in the Appellant's car for James Reeves' house where the victim was staying. The Appellant escorted the victim from the house and took him to Turnbill, and the threesome drove to Robin Baker's house. At Baker's house, Turnbill borrowed a truck and drove the victim back to Backbone Ridge. Meanwhile, the Appellant returned to Reeves' house to compare a sample of the methamphetamine Turnbill had manufactured to that which the two suspected Murphy of stealing. The Appellant arrived at Backbone Ridge an hour to an hour and a half later and reported a match. Turnbill testified that the Appellant announced, "I went and got your gun" and asked "if [Turnbill] wanted to do it or if [Turnbill] wanted [the Appellant] to do it." Turnbill responded that he would do it, and he asked the victim if he had stolen the meth oil. The victim ran around the vehicle in an attempt to hide and denied any responsibility. Meanwhile, the Appellant took the pump shotgun from Turnbill and started shooting. The victim charged the Appellant and knocked him over, but the Appellant continued to fire. Turnbill stated that at this point, he ran to his truck. The Appellant threw the shotgun in the back of the truck, and Turnbill drove to his girlfriend's house. He took the truck, gun, and meth lab to a friend's house for safekeeping. Two days later, Turnbill returned and asked for the gun. Turnbill left for Kentucky soon after the victim's body was found.

After a jury trial, the Appellant was convicted of facilitation of first degree murder. On June 23, 2004, the trial court sentenced the Appellant as a Range II, multiple offender to forty years in the Department of Correction. The Appellant's motion for a new trial was denied on April 18, 2005. At this hearing, the trial court modified the Appellant's sentence to reflect a sentence of thirty-five years, concluding that the imposed forty-year sentence "is inappropriate under the *Blakely* ruling." This appeal followed.

## Analysis

## I. Right to a Fair Trial

The Appellant asserts that he was denied his fundamental right to a fair trial under the United States and Tennessee Constitutions due to the State's failure to: (A) disclose the terms of its plea agreement with Melvin Turnbill and (B) produce potentially exculpatory evidence.

### A. Plea Agreement

The Appellant argues that he was denied his fundamental right to a fair trial because the prosecution failed to fully disclose the terms of the plea agreement with the witness Turnbill. Specifically, the Appellant contends that the State failed to disclose that Turnbill would be permitted to serve his sentence in the DeKalb County Jail rather than in a Department of Correction facility. At the hearing on the motion for new trial, the proof established that Turnbill pled guilty on September 23, 2003, and remained an inmate of the county jail until December 17, 2004, when he was transferred to the Department of Correction. The prosecutor acknowledged that because Turnbill was being called as a witness, he would have remained at the jail until the trial had concluded, which occurred on April 15, 2004. The assistant district attorney testified that he was not aware that Turnbill was an inmate of the county jail until he was contacted by the victim's family. After being informed of this fact, the assistant district attorney contacted the DeKalb County Sheriff's Office, and Turnbill was transferred to Department of Correction custody on December 17, 2004.

The following colloquy then occurred:

Defense counsel: [W]as part of your plea agreement the fact that Mr. Turnbill would be allowed to serve his sentence in the DeKalb County jail?

Prosecutor: No, it was not.

Because the record fails to disclose any proof that the State had entered into an agreement that Turnbill's sentence could be served in the county jail, this issue is without merit.

### B. Exculpatory Evidence

Additionally, the Appellant asserts that the State was in possession of exculpatory evidence, namely "clothing worn by [Melvin Turnbill] at the time of his arrest contain[ing] considerable blood splatter emanating from events surrounding the death of [the victim]," that it failed to preserve and disclose. He cites as authority *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). At trial, Agent Krofssik testified that on September 25, 2002, he, along with Sheriff Emmoms, traveled to Kentucky to interview Turnbill, who, at the time, was incarcerated in Barren County on charges unrelated to the homicide. During this trip, Sheriff Emmoms collected the clothing that Turnbill was wearing on the date of the homicide, which was retained by the Sheriff's Department. Agent Krofssik stated that he did not submit the clothing for testing because:

Melvin Turnbill confessed to being there when the murder took place, confessed to being in the area of the shooting, so . . . if [the victim's] blood was on Melvin Turnbill's clothes, . . . I guess it would have confirmed that he was there, but he admits that he was there, and I have no doubt in my mind that he was there.

Relief under *Brady* is not available unless a defendant can demonstrate the following:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Moreover, the defendant has the burden of proving a constitutional violation by a preponderance of the evidence. *Id*.

With regard to factor one, the record fails to establish that the Appellant ever made a discovery request to inspect the items of clothing maintained by the Sheriff's Department. A form discovery request was filed, with the State responding "the State will grant you an open file." No further specific request was sought, with the first mention of the clothing's materiality appearing in a *Brady* motion that was presented over one year after the trial had concluded.

With regard to factor two, no proof is presented that the articles of clothing were ever suppressed by either the prosecution or law enforcement officials. The items of clothing from Turnbill were obtained by the Sheriff approximately one week after the homicide occurred and were retained by the DeKalb County Sheriff's Department. There is no proof in the record of when the items of clothing were misplaced or destroyed by the Sheriff's Department, or if, in fact, the clothing is missing. The record indicates that the prosecutor's office had an "open file" discovery policy; therefore, the Appellant was aware of, or through diligence could have become aware of, the fact that the items of clothing were in the possession of the Sheriff's Department.[1] Furthermore, the discovery procedures of Tenn. R. Crim. P. 16(c) would have permitted the Appellant's inspection of the clothing.

With regard to factor three, there is no proof that the evidence would have been favorable to the Appellant. The only reference to blood on Turnbill's clothing is found in his statement to the TBI, "The shirts in my truck that have blood on them is mine where I picked my sores" and at trial, when Turnbill further explained that his clothes had blood on them because he had picked his meth sores. Furthermore, the medical examiner testified that the shotgun was fired from a distance of six feet or greater and that he "would not expect" that the discharge of the weapon from that distance would cause blood to splatter from the victim onto the shooter or his clothing.

---

[1] A review of the investigative file would have revealed a memo by Agent Krofssik that Turnbill's clothing had been collected and was "being maintained by the DeKalb County Sheriff's Department."

With regard to factor four, the Appellant has failed to establish that the items of clothing are material. The Appellant was convicted of facilitating the crime of first degree murder. Thus, the State was required to prove only that the Appellant knew that another intended to commit the murder and that the Appellant knowingly furnished substantial assistance in the commission of that crime. *See* T.C.A. § 39-11-403(a) (2003). The proof supports the Appellant's conviction for this offense. James Reeves confirmed that the Appellant entered his residence looking for the victim because "Josh [the victim] had stole some dope from somebody." Reeves testified that the Appellant left with the victim and returned shortly thereafter without the victim and took the "dope" the victim had brought to the trailer. The witness, Robin Baker, placed the Appellant, Turnbill, and the victim together at her house shortly before the victim was murdered, and the forensic evidence connected the shotgun shells used in the homicide to the Appellant. Accordingly, we conclude that whether blood was on Turnbill's clothing was immaterial to the Appellant's conviction for facilitating first degree murder.

## II. *Blakely v. Washington*

The Appellant also asserts that his sentence was enhanced in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). The Appellant originally was sentenced to a forty-year sentence; however, at the hearing on the Appellant's motion for new trial on April 18, 2005, the Appellant's sentence was reduced to thirty-five years. The Appellant now claims that "even after a modification, [his] sentence remained enhanced above the statutory minimum based upon a myriad of factors neither admitted at trial nor proven by the State beyond a reasonable doubt." He contends that in view of *Blakely*, his sentence should be "modified to reflect the 32 ½ year statutory minimum."

We note initially that the *Blakely* claim has been rendered moot by the Tennessee Supreme Court's April 15, 2005 decision in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005). Our supreme court held that the 1989 Sentencing Reform Act "authorizes a discretionary, non-mandatory sentencing procedure . . . [which] sets out broad sentencing principles, enhancement and mitigating factors, and a presumptive sentence, all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature. Under the Reform Act, the finding of an enhancement factor does not mandate an increased sentence." *Id.* at 661. Accordingly, the court held that the Tennessee Sentencing Reform Act does not violate the Sixth Amendment guarantee of a jury trial and is, thus, not affected by the *Blakely* decision. *Id.* As such, the Appellant is not entitled to relief under *Blakely*.

Review of the record in this case reveals that the trial court explicitly found five applicable enhancing factors: (1) a previous history of criminal convictions, (6) that the victim was treated with exception cruelty, (9) a previous history of unwillingness to comply with conditions involving release into the community, (10) that the defendant employed a firearm, and (14) that the felony was committed while the Appellant was on probation. *See* T.C.A. § 40-35-114(2), (6), (9), (10), (14) (2003). We find no error in the application of these factors. Based upon these findings, we conclude that a sentence of thirty-five years is clearly justified.

**CONCLUSION**

Based upon the foregoing, we affirm the Appellant's judgment of conviction and resulting sentence of thirty-five years for facilitation of first degree murder.

_____
DAVID G. HAYES, JUDGE